Original

Approved: _____
          Jilan J. Kamal
          Assistant United States Attorney

Before:   THE HONORABLE KATHARINE H. PARKER
          United States Magistrate Judge
          Southern District of New York

**21 MAG 1949**

- - - - - - - - - - - - - - - - - -X
                                    :   **SEALED COMPLAINT**
UNITED STATES OF AMERICA            :
                                    :   Violations of
    - v. -                          :   18 U.S.C. §§ 1349,
                                    :   1028A
BAREND OBERHOLZER,                  :
    a/k/a "Barry Oberholzer," and   :   COUNTY OF OFFENSE:
JAROMY PITTARIO,                    :   NEW YORK
    a/k/a "Jaromy Jannard-Pittario,":
                                    :
          Defendants.               :
                                    :
- - - - - - - - - - - - - - - - - -X

SOUTHERN DISTRICT OF NEW YORK, ss.:

   TROY PITTENGER, being duly sworn, deposes and says that he is a Postal Inspector with the United States Postal Inspection Service ("USPIS"), and charges as follows:

## COUNT ONE
### (Conspiracy to Commit Wire Fraud & Mail Fraud)

   1.   From at least in or about August 2017, through in or about 2019, in the Southern District of New York and elsewhere, BAREND OBERHOLZER, a/k/a "Barry Oberholzer," and JAROMY PITTARIO, a/k/a "Jaromy Jannard-Pittario," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated and agreed together and with each other to commit wire fraud and mail fraud, in violation of Title 18, United States Code, Section 1349.

   2.   It was a part and an object of the conspiracy that BAREND OBERHOLZER, a/k/a "Barry Oberholzer," and JAROMY PITTARIO, a/k/a "Jaromy Jannard-Pittario," the defendants, and others known and unknown, knowingly and willfully, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false

and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting so to do, would and did place in a post office and authorized depository for mail matter, a matter and thing to be sent and delivered by the Postal Service, and would and did deposit and cause to be deposited a matter and thing to be sent and delivered by a private and commercial interstate carrier, and would and did take and receive therefrom, a matter and thing, and would and did cause to be delivered by mail and such carrier according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, such matter and thing, to wit, the defendants solicited investments in Start-Up-1 under false pretenses, including by falsely representing their financial solvency, access to cash, and use of investor funds, and caused stock certificates and executed investment agreements to be sent to victims via private interstate carriers, in violation of Title 18, United States Code, Section 1341.

3. It was further a part and object of the conspiracy that BAREND OBERHOLZER, a/k/a "Barry Oberholzer," and JAROMY PITTARIO, a/k/a "Jaromy Jannard-Pittario," the defendants, and others known and unknown, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writing, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendants solicited investments in Start-Up-1 under false pretenses, including by falsely representing their financial solvency, access to cash, and use of investor funds, and used and caused the use of interstate wire communications and transfers in furtherance of those acts, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
**(Aggravated Identity Theft)**

4. From at least in or about August 2017, through in or about 2019, in the Southern District of New York and elsewhere, BAREND OBERHOLZER, a/k/a "Barry Oberholzer," the defendant, knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during

and in relation to a felony enumerated in Title 18, United States Code, Section 1028A(c), to wit, OBERHOLZER solicited investments in Start-Up-1 by posing as a retired, four-star General in the United States Army, during and in relation to the wire fraud offense charged in Count One.

(Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

5.  I am a Postal Inspector with the USPIS for approximately four years, before which I was an Air Marshal for six years with the Federal Air Marshal Services.  For the past four years, I have been assigned to the mail fraud unit in the New York Division of USPIS.  This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses, and others, as well as my examination of email, reports, and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.  Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

### Overview of the Fraudulent Conduct

6.  As set forth below, and at all relevant times, BAREND OBERHOLZER, a/k/a "Barry Oberholzer," the defendant, was the co-founder and CEO of Start-Up-1, a defense technology start-up company based in both Colorado and California.  According to his publicly available LinkedIn profile, at all relevant times, JAROMY PITTARIO, a/k/a "Jaromy Jannard-Pittario," the defendant, served as the "co-founder and COO" of Start-Up-1.  Beginning in or around the first quarter of 2018, OBERHOLZER began soliciting investment in Start-Up-1, and a purported security device it had developed ("Security Device-1"), from at least two venture capital firms on false pretenses.  OBERHOLZER sent multiple emails to at least two venture capital firms, posing as a retired, four-star General in the United States Army ("Retired General-1"), who is currently employed by a private equity investment firm based in New York, New York ("Private Equity Firm-1").  Therein, OBERHOLZER, posing as Retired General-1,

3

endorsed and solicited investment in Start-Up-1 and Security Device-1.

7.   Moreover, beginning at least in or around April 2018, BAREND OBERHOLZER, a/k/a "Barry Oberholzer," and JAROMY PITTARIO, a/k/a "Jaromy Jannard-Pittario," the defendants, solicited investments in and loans for Start-Up-1 and Security Device-1 by falsely representing, among other things, their financial solvency, access to cash, and use of investor funds.

**Entities & Individuals**

8.   Based on my review of publicly available information from the website of the Delaware Department of State, the Colorado Department of State, and the California Department of State, I have learned the following, in substance and in part:

   a.   Start-Up-1 is a Delaware entity that was formed on or about February 26, 2018.

   b.   On or about April 10, 2018, Start-Up-1 was registered as a "foreign entity" with the Colorado Secretary of State. "BAREND OBERHOLZER," the defendant, was listed as the individual filing the registration.[1]  The address of registration was a particular residential address located in Castle Rock, Colorado (the "Oberholzer Colorado Residence"). Records from the Colorado Division of Motor Vehicles reflect that OBERHOLZER resided at the Oberholzer Colorado Residence during this time.

   c.   On or about February 22, 2019, Start-Up-1 was registered as a foreign corporation with the California Secretary of State.  OBERHOLZER was listed as the individual filing the registration.  The registration provided a particular address in West Hollywood, California (the "West Hollywood Address"), as the company address.

9.   Based on my review of records obtained from the operators of the West Hollywood Address, I have learned the following:

---

[1] In or around April 2018, the foreign entity registration was twice amended to correct the company's name from "Start-Up-1" to "Start-Up-1 Corp." Again, OBERHOLZER was listed as the individual who filed the amended statements of registration.

4

a. The West Hollywood Address is a co-working space on the penthouse floor of a large commercial building. The co-working space is a members-only lounge and office space that consists of common work areas, amenities, with conference rooms that members can reserve. Membership is charged monthly and requires filling out an application.

b. On or around April 24, 2018, BAREND OBERHOLZER, a/k/a "Barry Oberholzer," the defendant, submitted an application. Therein, he described himself as the "CEO and Co-founder of [Start-Up-1]," using the email address "barry@[start-Up-1].org" (the "Oberholzer Start-Up-1 Email Address").

c. The membership application included a space in which an existing member could sponsor any new applicant. In OBERHOLZER's application, he identified "Jaromy Pittario," as his "[b]usiness partner and co-founder." It also identifies Oberholzer as the co-founder of another venture, with PITTARIO, which purports to be an "award winning and worlds first terror app – [Start-Up-2]."[2]

d. The membership application for JAROMY PITTARIO, a/k/a "Jaromy Jannard-Pittario," the defendant, was previously submitted on or about January 24, 2018. Therein, PITTARIO provided the email addresses "jaromy@[start-up-2].com," and "jpittario@gmail.com,"[3] and identified himself as a "co-founder" of Start-Up-2.

10. Based on my review of publicly available websites, as well as records obtained from internet service providers, wireless service providers, as well as other records, I have learned the following, in substance and in part:

---

[2] I have reviewed the website associated with the mobile application "Security App-1" at www.[start-up-2].com (last visited October 2, 2020). The application purports to provide users with alerts regarding reported terrorist attacks in their vicinity. In a December 6, 2017, press release on the Start-Up-2 website, "Barry Oberholzer" is identified and cited multiple times as the "Founder" of Start-Up-2 and its namesake product, Security App-1.

[3] Based on my review of records obtained from internet service providers, the jpittario@gmail.com address was subscribed in the name of "JAROMY PITT," and included a cellphone number subscribed in the name "JAROMY PITTARIO."

5

a. Beginning in or around 2018 through in or around 2020, BAREND OBERHOLZER, a/k/a "Barry Oberholzer," the defendant, began marketing Security Device-1, a smartphone case that purportedly permitted its users to detect at a distance weapons or other dangerous items concealed on another person. In its earliest iteration, Security Device-1 consisted of a hardware case with radio wave imaging capabilities that synced and provided data to an application downloaded onto the user's smartphone. Security Device-1 purportedly provided the smartphone user with a "3-D image" of any approaching individual sufficiently detailed to identify any type of weapon (including explosives) that may be concealed on the person. Security Device-1 marketing materials also claimed that it had the ability to detect gunfire nearby, identify its location, and transmit this data to the user.

b. OBERHOLZER and JAROMY PITTARIO, a/k/a "Jaromy Jannard-Pittario," the defendant, initially marketed and sold Security Device-1 through defense technology trade shows and websites, as well as through the Start-Up-1 website, "Start-Up-1.org." Internet service provider records reflect, in part, that "Barry Oberholzer," was the domain owner of "Start-Up-1.org,"[4] list a cellphone number ending in 5344, (the Oberholzer Cellphone),[5] and that the start-up-1.org website was accessed many times from a static internet protocol ("IP") address associated with the Oberholzer Colorado Residence.

c. PITTARIO participated in the marketing and fundraising for Security Device-1. For instance, in an online article promoting Security Device-1 dated June 2018, PITTARIO and OBERHOLZER were photographed together accepting an award for

---

[4] Since at least June 2020, the website "www.Start-Up-1.org" redirects to the website for another defense technology start-up ("Start-Up-3") which appears to market a device that is virtually identical to Security Device-1, in that it also purports to be a "concealed weapon detection system." On its website, under the description of its leadership "team," Start-Up-3 identifies its senior management and identifies OBERHOLZER as its CEO. Based on my review of his publicly available LinkedIn profile, OBERHOLZER also identifies himself as the "Founder and CEO of Start-Up-3," from December 2017 until the present.

[5] Based on my review of wireless service records, I have learned, in part, that the Oberholzer Cellphone is subscribed in the name of "Barry Oberholzer," at the Oberholzer Colorado Residence.

Security App-1 from a web-based, defense industry publication, "American Security Today." Based on my review of emails pursuant to a judicially-authorized warrant, I have learned that PITTARIO engaged with potential investors by telephone, email, and in person. On Linkedin, PITTARIO's publicly available profile page shows, in part, a photograph of the defendant and, under the heading "Experience," identifies him as the "Co-Founder + COO" of "[Start-Up-1] ([Security App-1])," which he describes as being involved in "Safety + Security, Facial Recognition, Weapon Detection." PITTARIO's Linkedin profile also states that he left Start-Up-1 in June 2020.

11.  Based on my review of emails obtained pursuant to a judicially authorized search warrant, the defendants solicited investment in Start-Up-1 from individual investors as well as institutional investors, although the vast majority of Start-Up-1's funding came from individual investors.

### Oberholzer Solicits Venture Capital Investment Posing As Retired General-1

12.  Based on my review of records obtained from a venture capital firm ("Venture Capital Firm-1"), conversations with witnesses, as well as the review of emails and records obtained pursuant to a judicially authorized search warrant, I have learned the following, in substance and in part:

#### Victim-1

a.  On or around April 18, 2018, Victim-1, the co-Founder and Managing Partner of Venture Capital Firm-1, received an email, purporting to be from Retired General-1 (the "Fake Retired General Account"), about "an opportunity" to invest in Start-Up-1, which purportedly had "groundbreaking proprietary mobile technology," and whose goal "is to raise US$15 million between several funding partners for 30% equity of Start-Up-1" (the "April 18, 2018 Email"). The April 18, 2018 Email stated that Private Equity Firm-1 "[is] also willing to commit to this on a possible co-lead with [Private Equity Firm-1's] next generation technology fund." The April 18 Email was signed "Retired General-1" and contained a signature block that reflected Retired-General-1's title and position at Private Equity Firm-1, along with Private Equity Firm-1's business address in New York, New York. The Fake Retired General Account used a domain name that was similar, but not identical, to the actual Private Equity-1 domain name.

7

b. That same day, Victim-1 replied to the April 18 Email and requested Start-Up-1's investor deck and financials. On or about the following day, Victim-1 received an email from "Rebecca Parker," who purported to be an "Investment Manager" of the "Next Generation Fund" at Private Equity Firm-1 (the "April 19 Email"). Therein, "Rebecca Parker" informed Victim-1 that, because of the file size, a pitch deck would be sent via file transfer protocol ("FTP") and that the financials would follow in a separate email. Victim-1 subsequently received another email from "Rebecca Parker" containing the investment materials for Start-Up-1.

c. On or about April 23, 2018, Victim-1 emailed "Rebecca Parker" and requested, in substance and in part, to be put in contact with the founders of Start-Up-1. That same day, "Rebecca Parker" replied to Victim-1 (the "April 23 Email"), carbon copying the Fake Retired General Account. Shortly thereafter, "Parker" sent another email to Victim-1 and now copied in the Oberholzer Start-Up-1 Email Address. Therein, "Parker" introduced Victim-1 to "Barry Oberholzer," whom "Parker" identified as the founder of Start-Up-1. In subsequent emails, Victim-1 and "Barry Oberholzer" arranged a time to discuss the potential investment. Victim-1 ultimately declined to invest in Start-Up-1.

d. Based on conversations with Retired General-1, I have learned that BAREND OBERHOLZER, a/k/a "Barry Oberholzer," pitched Retired General-1 regarding an investment in Security Device-1 via LinkedIn and that Retired General-1 declined to do so. Retired General-1 does not know OBERHOLZER personally and the email account used to solicit Victim-1 (the Fake Retired General Account) was not one Retired General-1 had ever used. Neither Retired General-1 nor Private Equity-1 had any intention of investing in Start-Up-1 and had not endorsed or recommended investing in Start-Up-1 or Security Device-1 to anyone.

e. Based on conversations with representatives of Private Equity Firm-1, I have also learned that it has never employed an individual named "Rebecca Parker" as an "Investment Manager." I have also learned that the domain name of the Fake Retired General Account and the "Rebecca Parker" email address used to solicit Victim-1 is not and has never been used by Private Equity Firm-1.

<u>Victim-2</u>

13.  Based on my review of records obtained from another venture capital firm, which is based in California, ("Venture Capital Firm-2"), conversations with witnesses, as well as the review of emails and records obtained pursuant to a judicially authorized search warrant, I have learned the following, in substance and in part:

    a.  On or about April 25, 2018, Victim-2, the Founder and Managing Member at Venture Capital Firm-2, received an email from the Fake Retired General Account pitching the opportunity to invest in Start-Up-1 (the "April 25 Email"). Therein, the April 25 Email stated that Start-Up-1 "has developed the world's first mobile device which can x-ray any package or person for weapons/explosives/counter intel devices, from a distance" and claims that their products "will revolutionize the world's security industry." The April 25 Email was signed "Retired General-1" and contained a signature block that reflected Retired General-1's actual title and position at Private Equity Firm-1, along with Private Equity Firm-1's business address in New York, New York. That same day, Victim-2 replied and expressed interest in an introduction to Start-up-1 regarding the investment opportunity.

    b.  Also on or about April 25, 2018, the Fake Retired General Account emailed Victim-2, to introduce Victim-2 to "Barry," whom he identified as "the CEO at Start-Up-1." Using the email address Oberholzer Start-Up-1 Email Address, "Barry," thanked "Retired General-1" for the introduction and offered to provide Victim-2 with more information regarding the investment opportunity. In subsequent emails to Victim-2, concerning a potential investment in Start-Up-1, "Barry" identifies himself as "Barry H. Oberholzer Jr." the "CEO & Co-Founder" of "[Start-Up-1]".

    c.  Several weeks thereafter, Victim-2 received a voicemail from an individual identifying himself as "Barry" from "Start-Up-1," who identified himself as having been introduced by "Retired General-1." Therein, in substance and in part, "Barry" asked Victim-2 to contact him at the Oberholzer Cellphone to discuss a potential investment in Start-Up-1 and the Security Device-1.

14.  Based on my review of data and records provided by internet service providers and wireless services providers, I have learned the following:

9

   a. The Fake Retired General Account and the "Rebecca Parker" email account were both created in or around August 2017.

   b. Between in or around December 2017 and May 2018, the Fake Retired General Account, the Fake Investment Manager Account-1, and the Oberholzer Start-Up-1 Email Address were logged into multiple times from a static internet protocol ("IP") address then-assigned to the Oberholzer Colorado Residence.

**Oberholzer & Pittario Misrepresent
Their Use of Investor Funds & Financial Solvency**

Victim-3

 15. Based on my review of emails obtained pursuant to a judicially authorized search warrant, as well as financial records and other reports, I have learned the following, in substance and in part:

   a. On or about August 7, 2018, BAREND OBERHOLZER, a/k/a "Barry Oberholzer," the defendant, using the Oberholzer Start-Up-1 Email Address, sent an Investment Agreement ("Investment Agreement-1") to an individual investor, Victim-3. Therein, Victim-3 agreed to purchase 37.5 shares of common stock in Start-Up-1 for a purchase price of $75,000.

   b. The Investment Agreement-1 provided that the "funds [Victim-3] invests in [Start-Up-1] will be used to support the company's activities in developing [Security Device-1]."

   c. On or about August 8, 2018, Victim-3 signed Investment Agreement-1 and emailed it back to OBERHOLZER. Victim-3 intended to fund his investment using funds from his Investment Retirement Account ("IRA"). On or about August 14, 2018, OBERHOLZER revised the agreement to reflect instructions received from the custodian of Victim-3's IRA, signed Investment Agreement-1 again, and emailed it back to Victim-3. Victim-3 then executed the Investment Agreement-1 again and emailed it back to OBERHOLZER.

   d. On or about August 16, 2018, Victim-3's $75,000 investment was wired from an account at Citibank to a bank account ending in -3610 at Chase Bank (the "Start-Up-1 Account-

1"), held in the name Start-Up-1.  The wire transfer from Citibank transited through a settlement account located in the Southern District of New York and was processed through FedWire Fund Service at the Federal Reserve Bank in New York, New York.  The two signatories on the Start-Up-1 Account-1 are OBERHOLZER and JAROMY PITTARIO, a/k/a Jaromy Jannard-Pittario, the defendant.  Prior to receiving the $75,000 wire from Victim-3, the Start-Up-1 Account-1 had a balance of $8.71. In the approximately two weeks that followed, OBERHOLZER disbursed at least $44,000 of Victim-3's investment as follows:

    i.  On or about August 16, 2018, approximately $44,000 was transferred from the Start-Up-1 Account-1 to an account, ending in 6961, held in the name of the "BMCC Trust," whose sole signatory is OBERHOLZER (the "BMCC Trust Account-1").  On or about August 15, 2018, the balance of BMCC Trust Account-1 was approximately $325.69.  Based on my review of corporate registry information, as well as publicly available websites, "BMCC Trust" is a now-defunct corporate entity previously registered with the Colorado Secretary of State, whose business address was the Oberholzer Colorado Residence.[6]

    ii.  On or about August 16, 2018, approximately $3,000 was transferred from the BMCC Trust Account-1 to another account, held in the name of "Heli Global", a now-dissolved corporate entity previously registered with the Colorado Secretary of State, whose business address was also the Oberholzer Colorado Residence (the "Heli Global Account").  The sole signatory on the Heli Global Account is OBERHOLZER.

    iii.  On or about August 17, 2018, the BMCC Trust Account-1 transferred approximately $3,650 to a third party account in the name of "Crescent

---

[6] BMCC Trust is also the entity identified as the publisher of OBERHOLZER's memoir "The Black Market Concierge: Sanction Busting, Smuggling & Spying for America," an e-book available for sale online at Amazon.com. *See* https://www.amazon.com/Black-Market-Concierge-Sanction-Smuggling/dp/0692187251/ref=tmm_hrd_swatch_0?_encoding=UTF8&qid=&sr= (last visited November 30, 2020.).

11

        Capital Holdings," with the reference "[Oberholzer Colorado Residence] Rental."

    iv.    Also on or about August 17, 2018, the BMCC Trust Account-1 transferred approximately $5,000 to a law firm based in Los Angeles specializing in white collar criminal defense.

    v.    Between in or around August 16, 2018, and in or around August 30, 2018, the BMCC Trust Account-1 spent approximately $21,990 over approximately 156 debit transactions, at least approximately $6,179 of which appeared related to hotels, short term home and car rentals. The majority of the remaining disbursements appear to be personal and unrelated to the development of Security Device-1, such as payments for groceries, personal effects, dining out, veterinary and doctors' bills, and car insurance.

    e.    On or about August 22, 2018, OBERHOLZER emailed Victim-3 and stated "one of our investors was unfortunately diagnosed with a terminal illness and it didn't feel right to have him invest during such a stage of his life so we decided to return his part. That means we hold in reserve an additional 2.5% if you know of alternative investors at some stage." Two days later, Victim-3 agreed to invest an additional $75,000.

    f.    On or about August 27, 2018, Victim-3 and OBERHOLZER, on behalf of Start-Up-1, executed another Investment Agreement ("Investment Agreement-2"). Investment Agreement-2 was materially identical to Investment Agreement-1, and included the same provision limiting the use of investor funds "to support the company's activities in developing [Security Device-1]."

    g.    On or about August 31, 2018, Victim-3's second, $75,000 investment was wired from an account at Citibank to the Start-Up-1 Account-1. The wire transfer from Citibank transited through a settlement account located in the Southern District of New York and was processed through the FedWire Fund Service at the Federal Reserve Bank in New York, New York. The day before Victim-3's second investment, the Start-Up-1 Account-1 had a balance of approximately $1.79.

    h.    On or about August 31, 2018, the Start-Up-1 Account-1 wired $73,000 to the BMCC Trust Account-1. On or about

August 30, 2018, prior to this transfer, the BMCC Trust Account-1 Account had a balance of approximately $5465.75. These funds were disbursed as follows:

      i. On or about September 4, 2018, BMCC Trust Account-1 wired approximately $2,500 to a company named "Tip to Tail Peru" with the reference "Shipping Refund DTS Aviation."[7]

      ii. On or about September 4, 2018, BMCC Trust Account-1 wired approximately $3,650 to a third party account held in the name of Crescent Capital Holdings, with the reference "[Oberholzer Colorado Residence] Rental."

      iii. Between on or about August 31, 2018, and October 9, 2018, BMCC Trust Account-1 disbursed approximately $49,215 over approximately 439 debit transactions, the majority of which appear to be personal expenses. These include at least $4,000 on retailers such as TJ Maxx, Amazon, and Sams Club, at least $1500 on groceries, $600 in hair styling, as well as well as tickets to Disneyland. These expenses also included at least approximately $6,000 in airfare, more than $6,000 on luxury hotels and short-term housing rentals, and at least $3,500 in dining expenses.

      iv. Between in or around September 4, 2018, and in or around October 9, 2018, approximately $23,545 was wired back to the Start-Up-1 Account-1 from BMCC Trust Account-1.

      i. On or about September 14, 2018, OBERHOLZER emailed Victim-3 again to advise him of another investment opportunity in Start-Up-1. OBERHOLZER stated that "Jaromy and I were speaking earlier this morning" and that "in order to expedite our demo to market (and to Maven) and keeping our financial requirements in consideration and past success we had

---

[7] Based on my review of publicly availably records only with the Colorado Secretary of State, Heli Global was dissolved on or about November 21, 2018; its registered agent was listed as "DTS Aviation," and its street address was the Oberholzer Colorado Residence.

13

with the individual round, we think it might be better to approach it like another individual round, allow up to 10 individuals at 200k each to makeup the balance of $2m."

   j. On or about September 28, 2018, Victim-3 emailed OBERHOLZER and stated, "I have decided to do the additional $200,000 investment and will initiate the process today."

   k. On or about October 3, 2018, Victim-3 and OBERHOLZER, on behalf of Start-Up-1, executed an Investment Agreement ("Investment Agreement-3"), which was materially identical to Investment Agreement-2 and Investment Agreement-1. In particular, Investment Agreement-3 limited the use of Victim-3's funds to "support the company's activities in developing [Security Device-1]."

   l. On or about October 10, 2018, Victim-3's third, investment of $200,000 was wired from an account at Citibank to the Start-Up-1 Account-1. The wire transfer from Citibank transited through a settlement account located in the Southern District of New York and was processed through the FedWire Fund Service at the Federal Reserve Bank in New York, New York. Prior to the $200,000 investment, the balance of the Start-Up-1 Account-1 was $76.51. The $200,000 received from Victim-3 was disbursed as follows:

      i. That same day, approximately $9,400 was wired to a bank account ending in –8315, held in the name of JAROMY PITTARIO, a/k/a "Jaromy Jannard-Pittario," the defendant (the "Pittario Account-1"). Prior to the transfer, the balance in the Pitterio Account-1 was approximately $-2,031.73.

      ii. On or about October 11, 2018, approximately $67,573 was transferred to BMCC Trust Account-1.

      iii. On or about October 17, 2018, another $5,000 was transferred to the Pittario Account-1.

   m. By on or about October 31, 2018, the Pittario Account-1 had disbursed almost the entire approximately $14,400 received from Start-Up Account-1 as follows:

      i. On or about October 17, 2018, the Pittario Account-1 made an international wire transfer

14

        of approximately $5,100 (with an additional $259.47 the following day) with the reference "puppies" to Individual-1.  Based on my review on publicly available websites, Individual-1 appears to be a canine breeder.

    ii.    During the period between October 10, 2018 and October 31, 2018, Pittario Account-1 disbursed approximately $3,600 in cash.

    iii.    During the period between October 10, 2018 and October 31, 2028, Pittario Account-1 disbursed approximately $4,735 in personal expenses, such as payment of utility bills, dining out, purchases at online retailers and credit card payments.

    n.    Once the approximately $67,573 was transferred to BMCC Trust Account-1, the following debit payments were made from BMCC Trust Account-1:

    i.    On or about October 12, 2018, approximately $3,650 was wired to a third party account held in the name of Crescent Capital Holdings, with the reference "[Oberholzer Colorado Residence] Rental."

    ii.    On or about October 16, 2018, approximately $2,298 was paid to "Rock Solid Custom Granite," located in Colorado.

    iii.    On or about October 24, 2018, approximately $3,752 was paid to "Millard Plastic Surgery," also located in Colorado.

    iv.    On or about November 2, 2018, another approximately $3,650 was wired to a third party account held in the name of Crescent Capital Holdings, with the reference "[Oberholzer Colorado Residence] Rental."

    v.    Between on or about October 10, 2018 and October 30, 2018, BMCC Trust Account-1 made an additional approximately 223 debit transactions totaling $22,755.  The vast majority do not appear to bear any

15

relationship to the development of Security Device-1.

o. Between on or about October 30, 2018 and November 26, 2016, BMCC Trust Account-1 wired approximately $95,398 back to Start-Up-1 Account-1.

### Oberholzer & Pittario Misrepresent Their Solvency to Attract Investors

#### Victim-4

16. Based on my review of emails obtained pursuant to a judicially authorized search warrant, as well as financial records and other reports, I have learned the following, in substance and in part:

a. Beginning in or around May 2019, BAREND OBERHOLZER, a/k/a "Barry Oberholzer," and JAROMY PITTARIO, a/k/a "Jaromy Jannard-Pittario," the defendants, began to solicit an investment in the form of a loan for $1,000,000 from Victim-4, a Massachusetts-based information technology services firm with an office in lower Manhattan, New York. The point of contact at Victim-4 was its President and CEO ("Victim-4 President"), who worked from the Victim-4 offices in Manhattan.

b. On or about June 19, 2019, Victim-4 President emailed OBERHOLZER and PITTARIO concerning the terms of a potential loan to Start-Up-1 (the "June 19, 2019 Email"). Therein, Victim-4 President stated "Our lawyers worked up the contract today please review and sign the document and send back to me. Jaromy please send me a copy of your bank statements for the personal guarantee, as soon as I get those statements and the documents signed I can issue the wire transfer as early as tomorrow." Attached to the June 19, 2019 Email was a proposed copy of the loan agreement (the "Victim-4 Loan Agreement").

c. The Victim-4 Loan Agreement proposed to loan Start-Up Company-1 $1,000,000. In exchange, Victim-4 would receive interest payments and an option to purchase significant equity in Start-Up-1, among other things. In particular, the Victim-4 Loan Agreement provided that "[t]his Loan is secured in the form of a personal guaranty from Jaromy Jannard-Pittario, in his personal capacity. The personal guaranty attached as Exhibit B is incorporated herein by reference." As reflected in the June 19 Email, Victim-4 requested proof of PITTARIO's

16

solvency to guarantee a loan of this size before agreeing to extend the loan.

   d. OBERHOLZER replied to the June 19 Email the same day, carbon copying PITTARIO. Attached to the reply was an executed copy of the Victim-4 Loan Agreement, which reflected OBERHOLZER's signature as CEO of Start-Up-1, and PITTARIO's signature on Exhibit B as the guarantor of the loan. Therein, OBERHOLZER also stated that, he would "Fedex you an original set of the agreement and personal guarantee with the issued stock certificate as per the agreement," once he had received the countersigned documents.

   e. On or about June 20, 2019, PITTARIO emailed Victim-4, carbon copying OBERHOLZER, "please see my attached personal Chase statement and my CS [Charles Schwab] investment statement." Two documents were attached. The first, titled "20190531-statements-8315" purported to be the account statement for the Pittario Account-1 from April 30, 2019 through May 31, 2019 (the "Pittario Account-1 Statement"). It reflected a beginning balance of approximately $217,593.19 and an ending balance of approximately $233,780.18.

   f. The second document, titled "BrokerageStatement053119," purported to be the Charles Schwab brokerage statement for the "Jaromy Pittario Trust" for the period May 1, 2019 to May 31, 2019 (the "Pittario Brokerage Account Statement"). It reflected a starting balance of approximately $8,332,600.73 and an ending balance of approximately $8,492,320.02.

   g. As described below, both the Pittario Account-1 Statement and the Pittario Brokerage Account Statement were falsified to inflate the values of these accounts.

   h. Based on my review of financial records, I have learned, in part, that the actual Pittario Account-1 Statement for the statement period of April 25, 2019 through May 24, 2019, reflected a starting balance of approximately $2,216.32 and an ending balance of approximately $-1,438. I have also learned, in part, that the Pittario Brokerage Account Statement for the statement period of April 1 to May 31, 2019, reflected a starting balance of just $2.12 and an ending balance of zero for the statement period of April 1 to May 31, 2019. In fact, at no point during that period did the value of the Pittario Brokerage Account exceed $2.12.

   i. After receipt of these records, on or about June 20, 2019, Victim-4 President countersigned the loan agreement and emailed it back to OBERHOLZER and PITTARIO. That same day, Victim-4 wired $1,000,000 to a bank account ending in -3821 held in the name of Start-Up-1 ("Start-Up Company-1 Account-2"). PITTARIO was the sole signatories on the Start-Up Company-1 Account-1.

   j. Within 48 hours, approximately $952,101.90 was disbursed from the Start-Up Company-1 Account-2. The majority of the disbursements appear to consist of payments on overdue invoices from vendors, consultants, and contractors associated with the development of the Security Device-1. Of the $952,101.90, the Start-Up Company-1 Account-2 disbursed approximately $193,983.43 to an account ending in -1345 at BBVA Bank, in the name of BMCC Trust, (the "BMCC Trust Account-2)", whose sole signatory is OBERHOLZER; approximately $125,537 to Pittario Account-1, held solely in the name of PITTARIO; and approximately $56,000 to a former employee and investor of Start-Up-1, who threatened to bring a civil suit against OBERHOLZER and Start-Up-1. In addition, approximately $2,879.80 was disbursed to BMCC Trust Account-2 on or about July 1, 2019.

 WHEREFORE, I respectfully request that a warrant be issued for the arrest of BAREND OBERHOLZER, a/k/a "Barry Oberholzer," and JAROMY PITTARIO, the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

       /s/ Troy Pittenger
       _____
       TROY PITTENGER
       Postal Inspector
       United States Postal Inspection Service

Sworn to me through the transmission
of this Affidavit by reliable electronic means,
pursuant to Federal Rules of Criminal Procedure
41(d)(3) and 4.1, this 19 th day of February, 2021

_____
THE HONORABLE KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK